UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
PAMELA OLSEN, DEIRDRE KETCHAM,
and NOREEN CRIBBIN,

                     Plaintiffs,        <u>MEMORANDUM</u>
                                            <u>OPINION AND ORDER</u>
      -against-

                                        CV 05-3623 (ETB)

THE COUNTY OF NASSAU, DETECTIVE
LIEUTENANT VINCENT ROBUSTELLI,
SERGEANT STEVEN ZETH, SERGEANT
ROBERT ATCHISON, DETECTIVE KEN
CATALANI and DETECTIVE KEN SCHMITT,
(in their official and individual capacities),

                     Defendants.
----------------------------------------------------------------X

       Before the Court is the defendants' motion for judgment as a matter of law, pursuant to

Federal Rule of Civil Procedure 50(b), or in the alternative, for a new trial, pursuant to Federal

Rule of Civil Procedure 59(a), with respect to some, but not all, of the findings made by the jury

at the conclusion of the civil trial in this action. For the following reasons, defendants' motion is

denied in its entirety.


<u>B</u><u>ACKGROUND</u>

       Familiarity with the underlying facts of this action is assumed. Plaintiffs, Pamela Olsen

("Olsen"), Deirdre Ketcham ("Ketcham") and Noreen Cribbin ("Cribbin") (collectively referred

to as "plaintiffs"), commenced this action in 2005, alleging that defendants, The County of

Nassau (the "County"), Detective Lieutenant Vincent Robustelli ("Robustelli"), Sergeant Steven

Zeth ("Zeth"), Sergeant Robert Atchison ("Atchison"), Detective Ken Catalani ("Catalani") and

-1-

Detective Ken Schmitt ("Schmitt") (collectively "defendants"), impermissibly discriminated against them in the terms and conditions of their employment with the Nassau County Police Department ("NCPD") on the basis of their gender. Plaintiffs asserted their discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., 42 U.S.C. § 1983 and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. Plaintiffs also asserted claims for First Amendment retaliation pursuant to Section 1983.

A jury trial was conducted in this action from October 6, 2008 to November 7, 2008. After all of the evidence was submitted, the Court granted judgment as a matter of law in favor of defendants, pursuant to Federal Rule of Civil Procedure 50(a), with respect to the following: (1) plaintiffs' New York State Human Rights claims; (2) plaintiffs' First Amendment retaliation claims; (3) the Section 1983 claims asserted against the individual defendants in their official capacities; and, (4) the Section 1983 claims asserted against defendants Catalani and Schmitt in their individual capacities. See Olsen v. County of Nassau, No. CV 05-3626, 2008 U.S. Dist. LEXIS 90426, at *20-21 (E.D.N.Y. Nov. 5, 2008). As a result of that decision, defendants Catalani and Schmitt were dismissed from the action entirely. Id. at *21.

The jury rendered its verdict on the remaining claims on November 14, 2008, finding in favor of plaintiffs with respect to the following: (1) plaintiffs' Title VII claims against the County for disparate treatment based on gender; (2) plaintiff Olsen's and plaintiff Ketcham's Title VII retaliation claims against the County; (3) plaintiff Olsen's and plaintiff Ketcham's Section 1983 claims for denial of equal protection against defendant Atchison; and, (4) plaintiffs' Section 1983 claims against the County for denial of equal protection. The jury awarded plaintiffs $1 million in compensatory damages with respect to their claims against the

County and $3 in nominal damages with regard to their claims against defendant Atchison.[1]

(Def. Ex. C.)

The jury found that plaintiffs did not prevail on the following claims: (1) plaintiffs' Title VII claims against the County for a hostile work environment based on sexual harassment; (2) plaintiff Cribbin's Title VII retaliation claim against the County; and, (3) plaintiff's Section 1983 claims against defendants Robustelli and Zeth for denial of equal protection. Accordingly, the only defendants that remain in this action are the County and defendant Atchison.

Defendants now move for judgment as a matter of law, or alternatively, for a new trial, with respect to the following jury findings: (1) that the County is liable for disparate treatment based on gender, pursuant to Title VII; (2) that defendant Atchison violated plaintiff Olsen's and plaintiff Ketcham's equal protection rights under Section 1983; and, (3) that plaintiffs be awarded $1 million in compensatory damages. Defendants base their motion on three grounds: (1) that a portion of the jury charge was erroneous; (2) that defendant Atchison is entitled to qualified immunity and therefore cannot be held liable for violating plaintiffs' equal protection rights; and, (3) that the damages awarded by the jury are excessive. Defendants do not challenge the jury's findings with respect to the County's liability for violating plaintiffs' equal protection rights under Section 1983 and for retaliation pursuant to Title VII.

---

[1] The individual compensatory damage awards were as follows: (1) $500,000 to Olsen; (2) $400,000 to Ketcham; and (3) $100,000 to Cribbin. (Def. Ex. C.)

<u>DISCUSSION</u>

I.    <u>Legal Standard</u>

Judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b), "is appropriately granted only when the court determines that 'there is no legally sufficient evidentiary basis for a reasonable jury to find for a party.'" <u>Ruhling v. Newsday, Inc.</u>, No. CV 04-2430, 2008 U.S. Dist. LEXIS 38936, at * 9 (E.D.N.Y. May 13, 2008) (quoting <u>Merrill Lynch Interfunding, Inc. v. Argenti</u>, 155 F.3d 113, 120 (2d Cir. 1998)) (additional citations omitted). Accordingly, "[a] movant seeking to set aside a jury verdict faces a 'high bar.'" <u>Ruhling</u>, 2008 U.S. Dist. LEXIS 38936, at *10 (quoting <u>Lavin-McEleney v. Marist Coll.</u>, 239 F.3d 476, 479 (2d Cir. 2001)).

Under Rule 50, a jury verdict should be set aside only where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture," or where there exists "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict against [it]." <u>Ruhling</u>, 2008 U.S. Dist. LEXIS 38936, at *10 (quoting <u>Kosmynka v. Polaris Indus., Inc.</u>, 462 F.3d 74, 79 (2d Cir. 2006)) (alteration in original). When applying this standard, a court is required to view the evidence in the light most favorable to the non-moving party and must refrain from "assess[ing] the weight of conflicting evidence, pass[ing] on the credibility of the witnesses, or substitut[ing] its judgment for that of the jury." <u>Leblanc-Sternberg v. Fletcher</u>, 67 F.3d 412, 429 (2d Cir. 1995); <u>see also</u> <u>Tolbert v. Queens Coll.</u>, 242 F.3d 58, 70 (2d Cir. 2001).

Federal Rule of Civil Procedure 59, which supplies the standard for granting a new trial,

is less stringent than Rule 50.  See Manley v. Ambase Corp., 337 F.3d 237, 244-45 (2d Cir.

2003).  In contrast to a motion for judgment as a matter of law, "a new trial motion may be

granted even if there is substantial evidence to support the verdict."  DeWitt v. N.Y. State

Housing Fin. Agency, No. 97 Civ. 4651, 1999 U.S. Dist. LEXIS 13057, at *3 n.1 (S.D.N.Y.

Aug. 24, 1999) (quoting Bevevino v. Saydjari, 574 F.2d 676, 683 (2d Cir. 1978));

see also Ruhling, 2008 U.S. Dist. LEXIS 38936, at *10 ("On a motion for new trial, the judge

may grant a new trial even if there is substantial evidence to support the jury's verdict.").  In

addition, the court is not required to view the evidence in the light most favorable to the non-

moving party, but may weigh it independently.  See Ruhling, 2008 U.S. Dist. LEXIS 38936, at

*11 (citing Manley, 337 F.3d at 244-45).  However, a motion for a new trial may only be granted

where "the court is convinced that the jury reached a seriously erroneous result, or that the

verdict is against the weight of the evidence," Manley, 337 F.3d at 244-45, or "the trial was not

fair to the moving party."  DeWitt, 1999 U.S. Dist. LEXIS 13057, at *3 (quoting Mallis v.

Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983)).  "In evaluating a Rule 59 motion, the trial

judge's duty 'is essentially to see that there is no miscarriage of justice.'"  DeWitt, 1999 U.S.

Dist. LEXIS 13057, at *3 (quoting Sharkey v. Lasmo (AUL Ltd.), 55 F. Supp. 2d 279, 283

(S.D.N.Y. 1999)).

    With respect to damages, if the court determines that the jury's award is excessive, it may

do one of three things: (1) order a new trial; (2) order a new trial limited to damages; or, (3)

pursuant to the practice of remittitur, condition the denial of a motion for a new trial on the

plaintiff's acceptance of a reduced amount of damages.  See Ruhling, 2008 U.S. Dist. LEXIS

38936, at *11 (citing Cross v. N.Y. City Transit Auth., 417 F.3d 241, 258 (2d Cir. 2005)).  The

court may not, however, simply reduce the damages without affording the prevailing party the option of a new trial.  See Ruhling, 2008 U.S. Dist. LEXIS 38936, at *11 (citations omitted).


II.     The Jury Charge was Not Erroneous

"A jury charge is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000) (quoting LNC Investments, Inc. v. First Fid. Bank, N.A., 173 F.3d 454, 460 (2d Cir. 1999)).  Put another way, when determining whether a jury charge is erroneous, the court need only "satisfy itself that [the] instructions, taken as a whole and viewed in light of the evidence, show no tendency to confuse or mislead the jury as to principles of law which are applicable."  Hathaway v. Coughlin, 99 F.3d 550, 552-53 (2d Cir. 1996) (alteration in original). As the Second Circuit has emphasized, "the particular words used in a jury instruction may (depending on the circumstances) be less important than the meaning or substance of the charge as a whole."  Owen v. Thermatool Corp., 155 F.3d 137, 139 n.1 (2d Cir. 1998).

Where a jury instruction is found to be erroneous, a new trial is required unless the error is harmless.  See Gordon, 232 F.3d at 116 ("An erroneous instruction requires a new trial unless the error is harmless . . . .").  "An error is harmless only if the court is convinced that the error did not influence the jury's verdict."  Id. at 116 (citing LNC Investments, 173 F.3d at 462). Accordingly, an error in charging the jury "will not be grounds for reversal unless 'taken as a whole the jury instructions gave a misleading impression or inadequate understanding of the law.'"  Owen, 155 F.3d at 139 (quoting Luciano v. Olsten Corp., 110 F.3d 210, 218 (2d Cir. 1997)).

Defendants' challenge the following jury instruction:

## ADVERSE EMPLOYMENT ACTION

What is an adverse employment action? Under this section, adverse employment action is action by an employer that is material in nature. Not everything that makes an employee dissatisfied or displeased in the workplace is material. It must be something more than minor or trivial in nature. For example, a materially adverse employment action is when someone's pay or benefits are decreased. When an employee's job is changed in a way that significantly reduces the employee's career prospects, when a person is not promoted, when a person is terminated from employment. In the context of [the gender discrimination - disparate treatment] claim, the entry of an adverse training ledger entry, or an oral or written reprimand is not an adverse employment action. On the other hand, the initiation of disciplinary proceedings against an employee pursuant to Section 59, 209 or 210 [of the Nassau County Police Department Disciplinary Code], is an adverse employment action. Similarly, a transfer which involves a significant loss of responsibility, or the loss of overtime pay, constitutes an adverse employment action. The forced resignation of an employee, which is known as constructive discharge, is an adverse employment action.

You are further instructed, however, that a combination of seemingly minor incidents, once they reach a certain critical mass, may form the basis for a violation, even though each minor act, considered in isolation, would not otherwise rise to the level of an adverse employment action, as I have just defined them. Thus, otherwise minor incidents that occur often over a long period of time may be actionable where you find that a reasonable person of plaintiff's gender would find that the total circumstances of her working environment changed due to gender motivated discrimination, to become unreasonably inferior and adverse when compared to a typical or normal, not an ideal or model workplace. A position may become unreasonably inferior if there are repeated and severe incidents of gender-motivated harassment. This is referred to on the verdict sheet, and I'll discuss the verdict sheet with you at the end of the charge in more detail. It's referred to on the verdict sheet as gender motivated harassment.[2]

_____

[2] While defendants only specifically challenge the second paragraph of this jury instruction, which they refer to as the "Atmosphere Jury Charge," for the sake of completion, the

(Trial Tr. 4160-61.)

Defendants contend that the jury instruction is erroneous for a number of legal and policy reasons, but the thrust of their argument is that such an instruction has only been applied in Title VII retaliation claims and not in Title VII disparate treatment claims. While it is true that the Second Circuit has never applied such a jury instruction in the context of a disparate treatment claim, several district courts within this circuit have indeed done so, as discussed below.

In <u>Thomas v. New York City Health and Hospitals Corporation</u>, No. 02 Civ. 5159, 2004 WL 1962074, at *16 (S.D.N.Y. Sept. 1, 2004), the court found that although plaintiffs had "not alleged any incidents . . . that [could], in isolation, be considered adverse employment actions" within the context of their discrimination claims, the "Second Circuit has recognized the possibility that 'a combination of seemingly minor incidents' can satisfy [the adverse employment action] prong if they 'reach a critical mass.'" <u>Id.</u> (quoting <u>Phillips v. Bowen</u>, 278 F.3d 103, 109 (2d Cir. 2002)). The court went on to state that where a plaintiff alleges an adverse employment action "that is not among the actions judicially recognized as coming under this rubric," the plaintiff "'must show that (1) using an objective standard; (2) the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.'" <u>Thomas</u>, 2004 WL 1962074, at *16 (quoting <u>Phillips</u>, 278 F.3d at 109). Although the court in <u>Thomas</u> ultimately found that plaintiffs had failed to satisfy this standard, the court clearly applied the very same concept that the jury in the within action was instructed on in the context of a discrimination

---

entire jury instruction has been included.

claim.[3]

Similarly, in Joseph v. Thompson, No. 95 CV 4898, 2005 WL 3626778, at *9 (E.D.N.Y. Mar. 23, 2005), the court stated that "[l]esser actions or seemingly minor incidents can . . . be considered adverse employment actions once they reach a critical mass of unreasonable inferiority" when determining whether plaintiff suffered an adverse employment action for purposes of his Title VII discrimination and retaliation claims. Id. (quoting Barry v. New York City Police Dep't, No. 01-CIV-10627, 2004 WL 758299, at *6-7 (S.D.N.Y. Apr. 7, 2004)). Specifically, the court examined a series of incidents that occurred over a period of months to determine whether they "collectively constitute[d] materially adverse changes in the terms and conditions of plaintiff's employment." Id. at *10. However, like Thomas, the court in Joseph found that plaintiff failed to establish an adverse employment action, stating that "[t]ogether, [the] incidents [did] not reach a critical mass of unreasonable inferiority" and that they did not "suggest discrimination against plaintiff based on his race." Id. (citing Phillips, 278 F.3d at 109). While the plaintiff in Joseph may not have ultimately been successful in proving an adverse employment action, the court specifically applied the concept espoused in the jury instruction in the within action when determining a Title VII discrimination claim.

Finally, in a very recent case, Early v. Wyeth Pharmaceuticals, Inc., No. 07 Civ. 0947,

_____

[3] The Court notes that the discrimination claims in Thomas were brought pursuant to 42 U.S.C. §§ 1981 and 1983 and not Title VII. However, discrimination and retaliation claims brought under Sections 1981 and 1983 are analyzed the same as those brought pursuant to Title VII. See Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) ("In analyzing whether conduct was unlawfully discriminatory for purposes of § 1983, we borrow the burden-shifting framework of Title VII claims."); McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997) (applying Title VII framework to Section 1981 discrimination claim); Thomas, 2004 WL 1962074, at *16 n.7 (collecting cases).

2009 U.S. Dist. LEXIS 15758, at *39-40 (S.D.N.Y. Feb. 25, 2009), the court had to determine

whether a series of actions collectively constituted an "atmosphere of adverse acts" with respect

to plaintiff's Section 1981 disparate treatment claim.  After first noting that employment

discrimination claims brought pursuant to Section 1981 are "evaluated under the same standards

that apply to Title VII cases," id. at *33, the court then addressed plaintiff's argument that even

if the court were to find that plaintiff had not "suffered independently adverse employment

actions, summary judgment should still be denied under the theory that such acts, combined,

constitute an atmosphere of adverse acts." Id. at *39.  The Court went on to state that "[t]he

Second Circuit has held that 'a combination of seemingly minor incidents' may form the basis

for an adverse employment action once the incidents 'reach a critical mass.'" Id. (quoting

Phillips, 278 F.3d at 109).  More importantly, the court stated that "[w]hile most frequently used

in the First Amendment context, the atmosphere of adverse acts analysis has been used in Title

VII cases in this circuit." Id. at *40 (citing cases).  Moreover, and quite relevant to the within

action, the court specifically rejected defendants' argument that the principles set forth in

Phillips v. Bowen, 278 F.3d 103 (2d Cir. 2002), should not govern a Title VII claim because that

case dealt with First Amendment retaliation. Id. at *40 n.14.  Accordingly, there is ample case

law to support the challenged jury instruction in the instant action.

Moreover, when the challenged jury instruction is considered as a whole, it clearly

defines for the jury what is necessary to prove an adverse employment action under existing

Second Circuit law.  The jury was instructed that the actions taken by the defendants against

plaintiffs must have been "material" in order to qualify as adverse.  In addition, the jury was

specifically instructed that not every action that dissatisfies or displeases an employee is

material.  Moreover, the jury was told that in order for an employment action to be adverse, it must be something more than minor or trivial in nature.  Providing the jury with the further instruction that a "combination of seemingly minor incidents" may collectively form an adverse employment action did not lessen or detract from the first part of the instruction that an adverse employment action must be material in order for plaintiffs to have satisfied their burden.  Accordingly, the Court finds that the jurors were not misled or confused in any way with respect to what is an adverse employment action.

Since the Court finds that the jury instruction was not erroneous based on defendants' legal arguments, a discussion of the defendants' policy arguments is not necessary.  That having been said, however, there are strong policy reasons that support the challenged instruction on the circumstances presented here, which otherwise may not have been actionable.  Repeated acts of public ridicule, disparaging comments, minor disciplinary actions and unfavorable or undesirable work assignments - carried out with discriminatory animus - may be just as damaging and, in many cases, more damaging to a person's work environment than a single material adverse employment action, such as a promotion or demotion.  For that reason, these "otherwise minor incidents," if they "occur often and over a longer period of time," are "actionable" once "they attain [a] critical mass," as the jury herein found.  Phillips, 278 F.3d at 109 (pertaining to a First Amendment retaliation claim).

Moreover, with respect to defendants' contention that the Court failed to instruct the jury with regard to the 300-day statute of limitations for Title VII claims, the Court finds that defendants waived such an objection by failing to raise it at the charging conference, after the jury was instructed or after the jury rendered its verdict.  See Fed. R. Civ. P. 51( c)(2) (stating

that objections to jury instructions are only timely if (A) they are made "at the opportunity provided under Rule 51(b)(2)," which requires that objections be made "on the record and out of the jury's hearing before the instructions . . . are delivered" or (B) if "a party was not informed of an instruction . . . before that opportunity to object, and the party objects promptly after learning that the instruction . . . will be, or has been, given . . . ."). In their Reply Memorandum of Law, defendants argue that while they "could have raised the statute of limitations argument at the charging conference, it would have been fruitless" because the jurors had already heard testimony concerning events occurring between 1997 and the present. (Def. Reply Mem. of Law 6.) This argument is not persuasive. Plaintiffs and defendants agreed at the outset of the trial to limit testimony to the time period between 1997 and 2005 due to the fact that there were both Title VII claims and Section 1983 claims, which have a three-year statute of limitations. (Trial Tr. 21-24.) Defendants belated argument that they "may not have agreed to allow testimony outside the 300-day period" had they known of the jury instructions at that time is nothing more than speculative hindsight. The Court provided defendants with ample opportunity to raise their statute of limitations argument in objection to the jury instructions. Defendants chose not to take advantage of those opportunities. Accordingly, such an objection is deemed waived.

Based on the foregoing, the Court finds that the jury instruction was not erroneous and denies defendants' motion on those grounds.


III.    Defendant Atchison is Not Entitled to Qualified Immunity

Qualified immunity shields a government official sued in his individual capacity from "liability for civil damages insofar as [his] conduct does not violate clearly established statutory

and constitutional rights of which a reasonable person would have known." Frank v. Relin, 1 F.3d 1317, 1328 (2d Cir. 1993) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). In order for a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "[E]ven assuming a state official violates a plaintiff's constitutional rights, the official is protected nonetheless if he objectively and reasonably believed that he was acting lawfully." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 129 (2d Cir. 2004) (citing Luna v. Pico, 356 F.3d 481, 490 (2d Cir. 2004)); see also Loria v. Gorman, 306 F.3d 1271, 1282 (2d Cir. 2002) ("If the officer reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken."). If the official's belief was not objectively reasonable, however, "qualified immunity offers him no solace . . . ." Loria, 306 F.3d at 1282 (citing Harlow, 457 U.S. at 818-19).

In assessing a qualified immunity claim, the court must consider:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

Back, 365 F.3d at 129-30 (quoting Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991)); Dawson v. County of Westchester, 351 F. Supp. 2d 176, 197 (S.D.N.Y. 2004) (citations omitted); Wise v. N.Y. City Police Dep't, 928 F. Supp. 355, 370 (S.D.N.Y. 1996) (quoting Schecter v. Comptroller of New York, 79 F.3d 265, 271 (2d Cir. 1996)). Furthermore, the court's inquiry must be "viewed in the light most favorable to the injured party." Catletti v.

Rampe, 334 F.3d 225, 228 (2d Cir. 2003).

At the conclusion of the trial herein, the jury found defendant Atchison liable for "knowingly condoning Gender Based Disparate Treatment" with respect to plaintiffs Olsen and Ketcham, and awarded nominal damages of $1 to each. (Def. Ex. C.) The jury also found defendant Atchison liable for "participating in Gender Based Disparate Treatment" with respect to Ketcham, and identified Atchison's issuance of the "9/12/04 negative training ledger entry" as the basis for liability. (Def. Ex. C.) Defendants now contend that the jury's findings with respect to Atchison should be overturned on the grounds of qualified immunity. Specifically, defendants argue that, in performing his duties and responsibilities as a supervisor, defendant Atchison did not believe he was violating either Olsen's or Ketcham's constitutional rights and that it is objectively reasonable for Atchison to believe that his actions were lawful.

Applying the standards discussed above to the within action, the Court concludes that Atchison is not entitled to qualified immunity. "It is well-settled that the Fourteenth Amendment's protection extends to the right not to be discriminated against because of one's gender." Dawson, 351 F. Supp. 2d at 198 (quoting Rucci v. Thoubborron, 68 F. Supp. 2d 311, 327 (S.D.N.Y. 1999)) (additional citations omitted). In fact, "[t]he Supreme Court declared [thirty] years ago that individuals have a constitutional right under the equal protection clause to be free from sex discrimination in public employment." Annis, 136 F.3d at 254 (citing Davis v. Passman, 422 U.S. 228, 234-35 (1979)). Moreover, "[i]t is well-established in this Circuit . . . that a supervisor [such as Atchison] who is grossly negligent in permitting his subordinates to engage in gender discrimination can be held liable under § 1983." Wise, 928 F. Supp. at 370 (citing cases). Accordingly, the right alleged by plaintiffs to have been violated - the right to be

-14-

free from gender discrimination in the workplace - is defined with "reasonable specificity" as well as supported by the decisional law of both the Supreme Court and the Second Circuit.

In addition, "given [the] state of mind requirement and the well known underlying general legal principle[s], it is evident that [Atchison] knew that tolerating or engaging in disparate treatment of plaintiffs in the workplace on the basis of their sex was a violation of plaintiffs' rights." Back, 365 F.3d at 130 (quotation omitted). The jury herein found Atchison liable for intentional discrimination as well as condoning or permitting intentional discrimination to occur. While Atchison may have believed that he was not discriminating against plaintiffs in taking the actions that he did, "such a belief can not serve as a refuge in the discrimination context, for it cannot be considered 'objectively reasonable.'" Id. Indeed, as the Second Circuit has held, "it can never be objectively reasonable for a government official to act with the intent that is prohibited by law." Id. (quoting Locurto v. Safir, 264 F.3d 154, 169 (2d Cir. 2001)).

Based on the foregoing, and "under the facts interpreted most favorably to plaintiff[s], it was not reasonable for [Atchison] to adversely treat [plaintiffs] because [they were women]. Kantha v. Blue, 262 F. Supp. 2d 90, 109 (S.D.N.Y. 2003) (denying qualified immunity on plaintiff's § 1983 disparate treatment claim); see also Back, 365 F.3d at 130 (denying qualified immunity where it was possible that a jury could find that the individual defendants discriminated against plaintiff on the basis of sex in violation of § 1983); Dawson, 351 F. Supp. 2d at 198 (denying qualified immunity with respect to plaintiff's § 1983 claim where the individual defendant was "the cause" of the alleged sex discrimination and "under preexisting law a reasonable defendant official would have understood that his acts were unlawful"). Defendants' motion on those grounds is accordingly denied.

IV.    The Damages Awarded are Not Excessive

Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." Early v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir. 1990) (quoting Shu-Tao Lin v. McDonald Douglas Corp., 742 F.2d 45, 49 (2d Cir. 1984)). "The decision as to whether remittitur is required is committed to [the] Court's discretion." Watson v. E.S. Sutton, Inc., No. 02 Civ. 2739, 2005 U.S. Dist. LEXIS 31578, at *42 (S.D.N.Y. Sept. 6, 2005) (citing Rangolan v. County of Nassau, 370 F.3d 239, 245 (2d Cir. 2004)) (additional citation omitted).

In determining whether a jury's award is excessive, courts take into account awards rendered in similar cases, "bearing in mind that any given judgment depends on a unique set of facts and circumstances." Scala v. Moore McCormack Lines, 985 F.2d 680, 684 (2d Cir. 1993) (citing Nairn v. Nat'l R.R. Passenger Corp., 837 F.2d 565, 568 (2d Cir. 1988)). A jury's award of damages "may not be overturned unless it is so excessive that it shocks the conscience of the court." McGrory v. City of New York, No. 99 Civ. 4062, 2004 U.S. Dist. LEXIS 20425, at *42 (S.D.N.Y. Oct. 8, 2004) (citing Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 422-23 (1996)); see also Watson, 2005 U.S. Dist. LEXIS 31578, at *42-43 ("The Court must vacate an award under federal law when it is so excessive as to "shock the conscience.").

"To obtain emotional distress damages, a plaintiff must establish actual injury and the award must be 'supported by competent evidence' in addition to a plaintiff's subjective testimony." Quinby v. Westlb AG, No. 04 Civ. 7406, 2008 U.S. Dist. LEXIS 62366, at *7-8 (S.D.N.Y. Aug. 15, 2008) (quoting Patrolmen's Benevolent Ass'n of N.Y., Inc. v. City of New York, 310 F.3d 43, 55 (2d Cir. 2002)). However, a plaintiff's recovery of emotional distress

damages "is not preconditioned on whether she underwent treatment, psychiatric or otherwise." Jowers v. DME Interactive Holdings, Inc., No. 00 Civ. 4753, 2006 U.S. Dist. LEXIS 32536, at *11 (S.D.N.Y. May 22, 2006) (citation omitted).

Emotional distress awards within the Second Circuit can "generally be grouped into three categories of claims: 'garden-variety,' 'significant' and 'egregious.'" Khan v. HIP Centralized Lab Services, Inc., No. CV-03-2411, 2008 U.S. Dist. LEXIS 76721, at *30 (E.D.N.Y. Sept. 17, 2008) (quoting Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005)). In "garden variety" emotional distress claims, "the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or consequences of the injury." Kahn, 2008 U.S. Dist. LEXIS 76721, at *30-31 (quoting McGrory, 2004 U.S. Dist. LEXIS 20425, at *6) (additional citations omitted). Such claims typically "lack[] extraordinary circumstances" and are not supported by any medical corroboration. Quinby, 2008 U.S. Dist. LEXIS 62366, at *8 (citation omitted). "Garden variety" emotional distress claims "generally merit $30,000 to $125,000 awards."[4] Id. (awarding plaintiff $300,000 in emotional distress damages for a "garden variety" claim and noting that it was "at or above the upper range of reasonableness"); see also Lynch v. Town of Southampton,

---

[4] Defendants argue that emotional distress damage awards for "garden variety" claims range from $5,000 to $35,000. (Def. Mem. of Law 19.) However, defendants rely on a 2005 case, Rainone v. Potter, 388 F. Supp. 2d 120 (E.D.N.Y. 2005), as support for this statement. More recent cases find this range to be significantly higher, as discussed above. As one court pointed out when faced with a similar argument, "[defendant's] contention that 'garden variety' emotional damage awards are in the range of $5000 to $30,000 is . . . not persuasive, because those numbers appear to be at the low end of the range of damages . . . ." Watson, 2005 U.S. Dist. LEXIS 31578, at *45. The Watson court went on to state that while it is "correct that many decisions 'reduce awards to $30,000 or below,' . . . others 'uphold awards of more than $100,000 without discussion of protracted suffering, truly egregious conduct, or medical treatment.'" Id. at *45-46 (citing Cross v. N.Y. City Transit Auth., 417 F.3d 241, 259 n.4 (2d Cir. 2005)).

492 F. Supp. 2d 197, 207 (E.D.N.Y. 2007) (collecting cases); Watson, 2005 U.S. Dist. LEXIS 31578, at *46-47 ("The range of acceptable damages for emotional distress in adverse employment action cases lacking extraordinary circumstances seems to be from around $30,000 to $125,000.").

"Significant" emotional distress claims "differ from the garden-variety claims in that they are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." Kahn, 2008 U.S. Dist. LEXIS 76721, at *32 (quoting Rainone, 388 F. Supp. 2d at 122-23) (additional citations omitted). Finally, "egregious" emotional distress claims "generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." Kahn, 2008 U.S. Dist. LEXIS 76721, at *34-35 (quoting Rainone, 388 F. Supp. 2d at 123) (additional citation omitted). In "significant" or "egregious" cases, where there is typically evidence of "debilitating and permanent alterations in lifestyle," larger damage awards may be warranted. Quinby, 2008 U.S. Dist. LEXIS 62366, at *8 (citing Rainone, 388 F. Supp. 2d at 125); see also McGrory, 2004 U.S. Dist. LEXIS 20425, at *49 ("In other cases where the plaintiff's testimony has provided greater detail concerning the severity and duration of the emotional distress or the plaintiff has adduced expert testimony larger awards have been approved.").

The jury in the within action awarded emotional distress damages to plaintiffs as follows: (1) $500,000 to Olsen; (2) $400,000 to Ketcham; and (3) $100,000 to Cribbin. Defendants argue that these awards should be drastically reduced because "the damages suffered by Plaintiffs Ketcham and Cribbin rise to the level of mere 'garden variety' emotional distress . . . while the

damages suffered by Plaintiff Olsen at best can be viewed as being slightly more 'significant.' "
(Def. Mem. of Law 20-21.)  Defendants seek to reduce the damages awarded to between $5,000
and $35,000 for plaintiffs Ketcham and Cribbin and to less than $100,000 for plaintiff Olsen.
(Id. 22-24.)  In light of the testimony and evidence presented during the trial, as discussed below,
the Court finds the damages awarded by the jury to be appropriate.

  Plaintiff Ketcham testified that the discrimination she suffered affected her "immensely."
(Trial Tr. 372.)  Prior to the discrimination, Ketcham loved and enjoyed her job, but afterwards,
she felt "disillusioned and very disappointed."  (Trial Tr. 372.)  Ketcham further testified that the
discrimination she was subjected to caused her to become very "stressed" and "anxious" about
what would happen next at work (i.e., would someone "play a ridiculous prank" or "say
something offensive"), which carried over into her personal life.  (Trial Tr. 373-74.)  Ketcham
began to have less patience for her husband and her children and would arrive home from work
"very annoyed" and "aggravated."  (Trial Tr. 374.)  Physically, Ketcham suffered "pains running
down her arm" as well as "pains in her chest," fatigue and sleeplessness that caused her to
consult her physician out of fear that she was suffering a heart attack.  (Trial Tr. 375, 1337-38.)
Ketcham's physician performed an EKG, after which he concluded that Ketcham's pains were
the result of stress and anxiety.  (Trial Tr. 375.)  Ketcham's physician recommended that she
consult with a mental health professional to discuss her stress and anxiety.  (Trial Tr. 375, 487.)
In August 2005, Ketcham began seeing Deborah Mack ("Mack"), a clinical social worker and
psychotherapist, whom she continued to seek treatment from on approximately a weekly basis
until May 2008.  (Trial Tr. 376-77, 1340, 1348.)  With respect to whether the conduct she was
subjected to still affects her, Ketcham testified that she still becomes  upset every time she

recalls what happened.  (Trial Tr. 377.)

Mack testified that she diagnosed Ketcham with generalized anxiety disorder, stating that Ketcham met every criteria of that disorder, such that she was "extremely fatigued," had difficulties sleeping, was irritable, experienced "[m]uscle pain," and suffered from a "feeling of worry or anxiety . . . almost every day of her life" for a period of six months or more.  (Trial Tr. 1341-42, 1355.)  In addition, Ketcham suffered from migraine headaches, shingles, nightmares and feelings of powerlessness.  (Trial Tr. 1374, 1389.)  Mack testified that Ketcham attributed her anxiety to the discrimination she was being subjected to at work.  (Trial Tr. 1343.)  After hearing Ketcham describe her work environment, Mack concluded that it was the cause of Ketcham's stress and anxiety.  (Trial Tr. 1346.)  Although Mack found Ketcham to exhibit signs of depression, she concluded that Ketcham was not clinically depressed.  (Tr. 1365.)  Ketcham voluntarily decided to cease her therapy sessions in May 2008.  (Trial Tr. 1376.)  Mack testified that at the time Ketcham ended her therapy, her physical symptoms had dissipated and she was no longer suffering from generalized anxiety disorder, although she did still - and still does - experience "anxious days."  (Trial Tr. 1376.)

Similarly, plaintiff Cribbin testified that the conduct she was subjected to at work caused her to seek therapy on a weekly basis and ultimately begin taking antidepressants.  (Trial Tr. 1224-26, 1450.)  Cribbin began seeing a clinical social worker, Jill Balk ("Balk"), in August 2005 and still continued to seek treatment from Balk as of the time of the trial in this action.  (Trial Tr. 1449-50, 1765-66, 1773, 2415.)  Like Ketcham, Cribbin also began to have less patience, difficulty concentrating, and took her feelings of anger and frustration at her work situation out on her family.  (Trial Tr. 1224, 1763-64.)

Balk testified that when Cribbin first came to see her, she was experiencing feelings of disappointment, depression, anger, frustration and stress. (Trial Tr. 1758-60.) Cribbin further suffered from feelings of anger and powerlessness, experienced difficulties sleeping and a lack of motivation,[5] was very short-tempered, cried often, and began to "avoid certain situations in which she would come into contact with people that had given her a hard time." (Trial Tr. 1767, 1769, 2426.) Cribbin also expressed to Balk that she felt very "empty" and "isolated" at work, as well as a "lack of support" from her coworkers. (Trial Tr. 1758-60, 1763.) As a result of these symptoms, Balk ultimately diagnosed Cribbin with adjustment disorder with mixed emotional features[6] as well as posttraumatic stress features.[7] (Trial Tr. 1761, 2431.) Balk attributed Cribbin's symptoms to the behavior she was being subjected to at work, and more specifically to Cribbin's feelings that she was being treated differently because she was female. (Trial Tr. 1764.) Balk testified that although Cribbin had improved somewhat as a result of treatment, as of the time of the trial, she was still experiencing emotional damage. (Trial Tr. 1767-68.)

The emotional distress that plaintiff Olsen suffered was more severe than that of Ketcham

_____

[5] Balk explained that Cribbin experienced a lack of motivation in several ways: (1) to get up and go to work; (2) to take care of her house; and, (3) to "reach out to other people." (Trial Tr. 1770.)

[6] Balk defined adjustment disorder with mixed emotional features as "a significant response to stress or a series of stressors, with behavioral and emotional symptoms." (Trial Tr. 1762.)

[7] Balk described Cribbin's posttraumatic stress features as a "response to some kind of trauma." (Trial Tr. 1763.) Balk testified that she diagnosed Cribbin with posttraumatic stress features as opposed to posttraumatic stress disorder because a disorder would result in response to a more severe trauma than Cribbin had suffered, such as "death, a horrendous accident, a terminal illness, [or] a rape." (Trial Tr. 1763.)

and Cribbin. Olsen testified that the discrimination she was subjected to affected her eating and exercise habits, causing her weight to fluctuate. (Trial Tr. 791.) Olsen also testified that she avoided having friends and family over to her house, which affected her relationships. (Trial Tr. 791-92.) Olsen's sleeping patterns were also affected, causing her at times to sleep too much while at others to sleep too little. (Trial Tr. 792.) Olsen testified that she also experienced difficulty concentrating. (Trial Tr. 792.)

In August 2005, Olsen began treatment with a psychologist, Dr. Barry Butner. (Trial Tr. 1992-93.) Olsen met with Dr. Butner on a weekly basis and was still undergoing treatment as of the time of the trial in the within action. (Trial Tr. 1993-94.) Initially, Dr. Butner observed that Olsen was exhibiting "classic symptoms of depression and anxiety" due to the "circumstances in her life" at that time - namely, the discrimination she was being subjected to - and diagnosed Olsen as suffering from such. (Trial Tr. 1996.) Later, however, when Olsen's symptoms did not abate in any way, Dr. Butner changed his diagnosis to dysthymia, which he defined as a chronic "depressive neurosis." (Trial Tr. 1996.) Dr. Butner testified that his ultimate diagnosis of Olsen is that she suffers from adjustment disorder with mixed emotional features. (Trial Tr. 1996.)

Dr. Butner testified that Olsen's symptoms included palpitations and a rapid heart beat, for which she was taking the prescription medication Xanax. (Trial Tr. 2006.) Olsen also experienced problems sleeping, which included "early awakening, difficulty falling asleep and difficulty staying asleep," such that at times Olsen would sleep "long, long hours" and at other times she would not sleep at all. (Trial Tr. 2006.) Dr. Butner further testified that Olsen experienced similar problems with regard to her appetite in that at times she would be unable to eat and other times she would be unable to stop eating. (Trial Tr. 2006.) Olsen further suffered

from "very bad headaches," similar to migraines or "tension headaches," that Dr. Butner

described as "clearly related to nervousness."  (Trial Tr. 2006.)  Dr. Butner also stated that Olsen

"experienced a diminished frustrating tolerance, and as a consequence found herself to be

irritable."  (Trial Tr. 2007.)  Finally, Dr. Butner testified that Olsen's self-esteem was

"diminished" and that her energy levels and ability to concentrate were impaired.  (Trial Tr.

2007.)  Dr. Butner attributed Olsen's symptoms to the conduct she was subjected to at work.

(Trial Tr. 2005.)

Based on the evidence presented, the Court finds that the jury's determination of

damages was appropriate.  Accordingly, defendants' motion for remittitur is denied.


<u>Conclusion</u>

For the foregoing reasons, the defendants' motion for judgment as a matter of law, or,

alternatively, for a new trial, is denied in its entirety.

A status conference is scheduled for May 28, 2009 at 11:00 a.m. to discuss the equitable

relief sought in this action.


**SO ORDERED:**

Dated: Central Islip, New York
      May 7, 2009

                                 /s/ E. Thomas Boyle
                                 E. THOMAS BOYLE
                                 United States Magistrate Judge